**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 22-cv-00777-CMA-KLM

SYGHT, INC.,

      Plaintiff,

v.

SARA PARTEE, and
JONATHAN PARTEE,

      Defendants.

---

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION**

---

This matter is before the Court on Defendants Jonathan Partee and Sara

Partee's Motion to Dismiss for Lack of Personal Jurisdiction. (Doc. # 12.) For the

following reasons, the Motion is denied.

## I.    <u>BACKGROUND</u>

Plaintiff Syght, Inc. ("Syght") is a technology company engaged in the

development of advanced threat technologies. (Doc. # 1 at ¶ 7.) Prior to June 2020,

Syght was named Steel City Optronic, LLC ("Steel City"). (*Id.* at ¶¶ 9, 25.) Defendants

Sara Partee and Johnathan Partee were the sole or majority owners of Steel City at

various times from its establishment in April 2010. (*Id.* at ¶ 9.) Sara Partee served as

Steel City's Chief Executive Officer ("CEO") and later as the Chair and Executive Vice

President of Programs, and Jonathan Partee was Chief Scientist. (*Id.* at ¶¶ 10–11.)

This dispute arises from Sara Partee and Jonathan Partee's exit from the company. In or about March 2019, the parties began discussing Sara Partee selling her 43% ownership interest in Steel City. (*Id*. at ¶ 14.) Syght alleges that during the exit negotiation process, Jonathan Partee and Sara Partee each made false and misleading representations of fact and omissions of fact "[i]n an effort to maximize the purchase price for their ownership interest in [the company]."[1] (*Id*. at ¶¶ 15–20.) Specifically, Syght alleges that Jonathan Partee made misrepresentations to the company's officers and board concerning Plaintiff's product design, software development, intellectual property rights, R&D, and integration and prototyping. (*Id*. at ¶ 18.) This included a PowerPoint presentation made on March 7, 2019 ("PowerPoint"), in which Jonathan Partee represented that several technologies were "ready for integration and test." (*Id*. at ¶¶ 15–16.) Syght further alleges that Sara Partee, as the company's former CEO, made false and misleading representations of fact and omissions of fact to the company's officers and board concerning the company's business operations, including relevant prior agreements involving licenses and royalty rights. (*Id*. at ¶¶ 12–13, 19–20.)

Syght alleges that it relied on these false and misleading representations of fact and omissions of fact when it entered into a Membership Interest Redemption Agreement ("Agreement") with Sara Partee, whereunder Syght repurchased 1,125,000 membership units from Sara Partee for $1.8 million. (*Id*. at ¶ 21.) After the Agreement

---

[1] In 2019, Sara Partee owned approximately 43% of the membership interests in Steel City. (Doc. # 12 at ¶ 8.) Jonathan Partee did not own any membership interest in Steel City. (*Id*. at ¶ 13.) Defendants dispute that Jonathan Partee had any property interest in Sara Partee's membership units. (Doc. # 27 at 3 n.1.)

was executed on October 2, 2019, Syght "discovered that much of the technology allegedly developed by Jonathan Partee was nonfunctional." (*Id*. at ¶ 22). For example, Syght contends that "the passive millimeter imaging using compressive sensing was not feasible and had to be entirely redesigned over two additional years at a cost of over two million dollars." (*Id*.) In addition, shortly after the Agreement was executed, Syght was approached by a different company regarding its alleged licenses and royalty rights under a "Technology Commercialization Agreement" which Defendants had failed to disclose. (*Id*. at ¶ 24, 41.)

Syght filed this action against Defendants on March 29, 2022. (Doc. # 1.) In its Complaint, Syght alleges four claims for relief: (1) breach of fiduciary duty, (2) fraudulent inducement and misrepresentation, (3) negligent misrepresentation, and (4) unjust enrichment. (*Id*.) Defendants filed the instant Motion to Dismiss for Lack of Personal Jurisdiction on May 18, 2022. (Doc. # 12.) Syght filed a Response opposing the Motion (Doc. # 18), and Defendants filed their Reply shortly after (Doc. # 27).

## A.    RELEVANT JURISDICTIONAL FACTS

The following jurisdictional facts are taken from the Complaint, as well as the declarations and exhibits attached to the parties' briefing.

Steel City (now named Syght) was established as a Pennsylvania limited liability company in April 2010 with a registered address in Pennsylvania. (Doc. # 1 at ¶ 9.) Sara Partee owned at least 43% of the membership units in Steel City from the organization of the company to 2019. (Doc. # 12 at ¶ 8.) She was the CEO of Steel City from its organization in 2010 until 2016, and she was a manager of the company from

2010 to 2019. (*Id.* at ¶ 9.) Jonathan Partee was an employee of the company from 2010 until 2019. (Doc. # 18 at 2.) Sara and Jonathan Partee have lived at the same address in Pennsylvania since 2006, and the parties do not dispute that Sara and Jonathan are residents of Pennsylvania. (Doc. # 12 at ¶ 6.)

In 2016, the company hired Kevin Magenis as CEO and Charles Partee as Chief Technology Officer ("CTO"). (Doc. # 19 at ¶ 2; Doc. # 20 at ¶ 1.) Charles Partee and Kevin Magenis each also acquired some membership units in the company in 2015 and 2016.[2] (Doc. # 12 at ¶ 20.) Kevin Magenis and Charles Partee both resided in Colorado, and Jonathan Partee traveled to Colorado and personally interviewed Kevin Magenis for the CEO position. (Doc. # 19 at ¶ 2; Doc. # 20 at ¶ 8.) Prior to hiring Kevin Magenis, Jonathan Partee and Sara Partee understood that he intended to move the company's principal place of business to Colorado. (Doc. # 20 at ¶ 9.) Immediately upon starting as CEO, Kevin Magenis began holding weekly staff meetings from his office in Colorado, which both Jonathan Partee and Sara Partee regularly joined virtually from Pennsylvania. (*Id.*)

In 2017, Kevin Magenis signed an office lease in Longmont, Colorado for the company. (*Id.* at ¶ 10.) He also filed a Statement of Foreign Entity Authority with the Colorado Secretary of State, on which the company identified its "principal office address of the entity's principal office" as the address of the Longmont, Colorado office.

---

[2] Sara Partee became the sole owner of the company in 2014 and remained the sole owner until Charles Partee acquired membership units in 2015. (Doc. # 12-4 at ¶¶ 20, 25, 27.)

(*Id.* at ¶ 3; Doc. # 20-1 at 2.) The company continued to rent office and laboratory space in Pennsylvania in addition to its office in Colorado. (Doc. # 12 at ¶ 21.)

In 2018, Kevin Magenis opened a corporate bank account for the company at Wells Fargo Bank in Colorado. (Doc. # 20 at ¶ 13.) Sara Partee was one of the signatories on the account when it was opened. (*Id.*) Since that time, all of the company's corporate disbursements, including paychecks to Jonathan Partee and Sara Partee, have come from that account. (*Id.*)

Since 2017, all of the company's employees, excluding Jonathan Partee and Sara Partee, have worked at the company's offices in Colorado. (*Id.* at ¶ 10.) This includes the company's CEO, CFO, CTO, CMO and VP of Operations. (*Id.*) No executive of the company has officed outside of Colorado. (*Id.*) In 2019, at the time the Agreement was executed with Sara Partee and Jonathan Partee, the company had grown to a total of 17 employees working in Colorado, while Sara Partee and Jonathan Partee were the only employees working in Pennsylvania. (*Id.* at ¶ 11.) From 2016 to 2019, Sara Partee virtually attended meetings with and sent emails to company employees in Colorado. During that same time period, Jonathan Partee traveled to Colorado for business meetings, virtually attended meetings with company employees in Colorado, and sent emails to company employees in Colorado. (Doc. # 12 at ¶ 12; Doc. # 18 at 2.)

The PowerPoint referenced in the Complaint was presented at a Strategic Advisory Board ("SAB") meeting of the company held in Pittsburgh, Pennsylvania in March 2019. (Doc. # 12 at ¶ 24.) Jonathan Partee had sent an early draft of the

PowerPoint to Kevin Magenis and others on August 12, 2018, via email with the subject line "Deep Dive." (Doc. # 20 at ¶ 21.) The Agreement at issue in this case was signed by both Kevin Magenis and Charles Partee in Colorado in October 2019. (*Id.* at ¶ 22; Doc. # 19 at ¶ 4.)

On June 1, 2020, the company changed its state of formation to Delaware, its name to Syght, Inc., and its entity form to a corporation via statutory conversion. (Doc. # 20 at ¶ 4.) On June 2, 2020, Syght filed a Statement of Change Changing the Jurisdiction, Statement of Change Changing the True Name, and Statement of Change Changing the Entity Form with the Colorado Secretary of State. (*Id.*)

## II.    LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(2) allows a defendant to challenge the Court's jurisdiction over the named parties. As the plaintiff, Syght bears the burden of demonstrating that the Court has personal jurisdiction over Defendants. *See Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1069 (10th Cir. 2008). When, as here, the district court decides a Rule 12(b)(2) motion to dismiss without holding an evidentiary hearing, "the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008). "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant.'" *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998). In considering whether Defendants have sufficient contacts with this District to support the Court's exercise of personal jurisdiction, the

Court must accept all well pleaded facts and must resolve any factual disputes in Syght's favor. *See Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).

To establish personal jurisdiction over a nonresident defendant, a plaintiff must show both that jurisdiction is proper under the forum state's long-arm statute and that the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the United States Constitution. *See Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1357 (10th Cir. 1990). Colorado's long-arm statute permits the Court to exercise personal jurisdiction to the full extent of the Due Process Clause, and therefore, the analysis collapses into a single due process inquiry. *See* Colo. Rev. Stat. § 13-1-124(1); *Dart Int'l, Inc. v. Interactive Target Sys., Inc.*, 877 F. Supp. 541, 543 (D. Colo. 1995) (citing *Safari Outfitters, Inc. v. Superior Court*, 448 P.2d 783 (1968)).

"The Due Process Clause protects a [defendant's] liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). The cornerstone of the personal jurisdiction inquiry is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1532 (10th Cir. 1996) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). To comport with due process limitations, a court may exercise personal jurisdiction only over defendants that have "certain minimum contacts" with the

forum state. *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

When there are multiple defendants, as is the case here, "minimum contacts must be found as to each defendant over whom the court exercises jurisdiction." *Home-Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1020 (10th Cir. 1990). The minimum contacts standard may be satisfied in either of two ways—general or specific jurisdiction. *See Kuenzle v. HTM Sport–Und Freizeitgerate AG*, 102 F.3d 453, 455 (10th Cir. 1996). A court's duty is the same in either case: It must guarantee that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *World-Wide Volkswagen*, 444 U.S. at 292 (quoting *Int'l Shoe*, 326 U.S. at 316).

Specific jurisdiction depends on an "affiliation between the forum and the underlying controversy." *Id*. For a court to assert specific jurisdiction, the out-of-state defendant must have (1) purposefully directed its activities at residents of the forum, and (2) the litigation must result from alleged injuries that "arise out of or relate to" those activities. *Burger King*, 471 U.S. at 472. The purposeful direction requirement "ensures that defendants will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, . . . or of the unilateral activity of another party or a third person." *Id*. at 475.

## III.   DISCUSSION

Defendants Sara and Jonathan Partee move to dismiss this case on the basis that Syght cannot establish that this Court has general or specific personal jurisdiction over them in Colorado. *See generally* (Doc. # 12.) Syght does not contend that the

Court has general jurisdiction over Defendants. (Doc. # 18 at 6 n.1.) Thus, the Court's inquiry is limited to whether it can exercise specific jurisdiction over Defendants.

**A.    PURPOSEFULLY DIRECTED**

The first element of the "minimum contacts" standard requires that the out-of-state defendant must have "purposefully directed" its activities at residents of the forum state. *Dudnikov*, 514 F.3d at 1071 (citing *Burger King*, 471 U.S. at 472). This element "can appear in different guises." *Id.* In the tort context, the Court applies what is known as the *Calder* "effects" test. *See Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 966 (10th Cir. 2022) (citing *Calder v. Jones*, 465 U.S. 783 (1984)). The test analyzes whether an out-of-state defendant's tortious conduct satisfies three elements: "(1) an intentional action; (2) expressly aimed at the forum state; and (3) . . . knowledge that the brunt of the injury would be felt in the forum state." *Id.* at 966–67 (quoting *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1231 (10th Cir. 2020)). As the proponent of jurisdiction, Syght must demonstrate each element of the effects test to satisfy the purposeful direction standard. *Id.* at 967. To analyze the purposeful direction element in contract cases, courts "sometimes ask whether the defendant 'purposefully availed' itself of the privilege of conducting activities or consummating a transaction in the forum state." *Dudnikov*, 514 F.3d at 1071. The Court will first consider the *Calder* effects test for the three tort claims in this case and will then turn to the quasi-contractual unjust enrichment claim.

1.    Tort Claims: *Calder* Effects Test

The first *Calder* element—an "intentional action" by the defendant—"requires little discussion." *See Newsome v. Gallacher*, 722 F.3d 1257, 1268 (10th Cir. 2013). Syght adequately alleges three tort claims against Defendants, each of which requires an intentional act. Moreover, Defendants do not appear to dispute the first element. The Court therefore finds that the "intentional action" element is met. *See Dudnikov*, 514 F.3d at 1073 (noting allegations of an intentional tortious act satisfy the first *Calder* element); *see also Eighteen Seventy*, 32 F.4th at 968 (observing that the "first element is easily met" in an intentional tort action).

The parties vehemently dispute the second *Calder* element: whether Defendants' allegedly tortious actions were "expressly aimed" at the forum state. 465 U.S. at 789. "In determining whether a defendant expressly aimed his conduct at the forum state, 'a plaintiff's contacts with the defendant and forum' cannot 'drive the jurisdictional analysis.'" *Eighteen Seventy*, 32 F.4th at 969 (emphasis removed) (quoting *Walden v. Fiore*, 571 U.S. 277, 289 (2004)). Rather, the forum state must be the "focal point" of the defendant's tortious conduct. *Id.* (citing *Newsome*, 722 F.3d at 1268). In other words, Defendants' conduct must connect them to the forum "in a meaningful way." *Walden*, 571 U.S. at 290.

Defendants argue that the "focal point" of the alleged conduct in this case is Pennsylvania, not Colorado. (Doc. # 27 at 3.) According to Defendants, Syght has not shown that Defendants expressly aimed any of their alleged tortious conduct at Colorado because its claims arise from a time period when Syght was still Steel City, a

limited liability company organized under Pennsylvania law. (Doc. # 12 at ¶ 58.)
Defendants raise several arguments relating to Steel City's varied connections with
Pennsylvania in 2019, including that Steel City had a registered office in Pennsylvania
and all of the Company's tax returns showed a Pennsylvania address. (*Id.*) Further,
Defendants contend that they were physically located in Pennsylvania when they
engaged in the alleged conduct at issue in this case. (*Id.* at ¶ 59.)

Syght does not dispute any of the company's relevant connections to
Pennsylvania in 2019, including that its tax returns listed a Pennsylvania address and
that it was still a Pennsylvania LLC. (Doc. # 18 at 7.) Syght contends, however, that
Defendants' emphasis on the company's Pennsylvania connections and its former
name is "irrelevant" and "a red herring" because the company was a resident of
Colorado beginning in 2017. (*Id.* at 7, 9.) Indeed, Syght asserts that it has consistently
maintained its principal place of business in Colorado since 2017. (*Id.* at 7–8.) As such,
Syght contends that the "expressly aimed" element is met because Defendants directed
their tortious conduct at Syght, a resident of Colorado, and made their false and
misleading representations to Syght, its executives and board, and its customers and
investors—all in Colorado. (*Id.* at 10.)

As an initial matter, the Court finds there to be no genuine dispute that Syght's
principal place of business has been located in Colorado since 2017. A company's
"principal place of business" is where its "officers direct, control, and coordinate the
corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). Although
Defendants recite and reiterate numerous undisputed facts regarding the company's

origins in Pennsylvania and its connections to Pennsylvania, Defendants do not appear to actually contest that the company moved its principal place of business to Colorado in 2017 when it hired Kevin Magenis as CEO. (Doc. # 20 at ¶¶ 9–11.) Since 2017, all of Syght's executives, including the CEO, CFO, CTO, CMO and VP of Operations, and the vast majority of its employees, excluding Defendants, have worked at the Colorado office. (*Id.* at ¶ 10.) Accordingly, since 2017, the Colorado office has been the "nerve center" of the company, or "the actual center of direction, control, and coordination." *Hertz Corp.*, 559 U.S. at 93. The Court therefore finds that the company had its principal place of business in Colorado and was a resident of Colorado during the relevant time period. *See* 28 U.S.C. § 1391(c)(2) (a plaintiff corporation resides "in the judicial district in which it maintains its principal place of business").

Given that Syght was a resident of Colorado during the time period at issue in this case, the Court finds Defendants' argument that their alleged tortious conduct was "expressly aimed" at a "Pennsylvania LLC" to be hollow and misleading. To be sure, Syght—then Steel City—was a Pennsylvania LLC. However, Defendants were fully aware that the company's principal place of business moved to Colorado after they interviewed and hired CEO Kevin Magenis in 2017, and Defendants were employees and/or managers of the company for over two years when its principal place of business was located in Colorado. (Doc. # 20 at ¶¶ 8–10.) Moreover, Syght provided evidence in the Declaration of Kevin Magenis, undisputed by Defendants, that "Jonathan Partee and Sara Partee understood that [Magenis] intended to move Syght's principal place of business to Colorado" prior to hiring him. (*Id.* at ¶ 9.) For these reasons, the Court

rejects Defendants' arguments that rely on referring to the company as a "Pennsylvania LLC" or otherwise ignore the fact that the company was a resident of Colorado in 2019.

Defendants also argue that the alleged tortious activity was "neither conducted in nor directed towards Colorado" because Defendants were physically in Pennsylvania and performed all activities in Pennsylvania. (Doc. # 12 at ¶¶ 58–59.) However, a defendant need not be physically located in the forum state for his actions to be expressly aimed at that forum. *See Burger King,* 471 U.S. at 476. Instead, the relevant question is whether Colorado is the "focal point" of the alleged conduct.

In this case, Syght adequately alleges that Defendants made false and misleading representations of fact and omissions of fact to Syght's officers and board in order to "maximize the purchase price for [Sara Partee's] ownership interest" while negotiating their exit from the company. (Doc. # 1 at ¶ 18.) During the relevant time period, Sara Partee owned at least 43% of the membership units in the company, which was a resident of Colorado. (Doc. # 12-4 at ¶ 44.) Prior to the company establishing its principal place of business in Colorado, Jonathan Partee traveled to Colorado to interview and hire Kevin Magenis. (Doc. # 20 at ¶ 9.) Sara Partee became a signatory on a Colorado bank account opened by Magenis. (*Id.* at ¶ 13.) These facts all indicate that Sara and Jonathan Partee took active steps to facilitate the company moving its principal place of business to Colorado, and they then served as employees at the company for another two years. *See Benton v. Cameco Corp.*, 375 F.3d 1070, 1077 (10th Cir. 2004) (observing that in the contract context, "parties who reach out beyond one state and create continuing relationships and obligations with citizens of another

state are subject to regulation and sanctions in the other State for the consequences of their activities" (quoting *Burger King*, 471 U.S. at 473)). Further, most of the alleged tortious conduct in this case came in the form of misrepresentations made via oral and written communications to Syght's officers and executives in Colorado. Considering all of these circumstances, and Defendants' full knowledge that Syght was a company with its principal place of business in Colorado for several years prior to Defendants' alleged tortious activity, the Court finds that Syght has adequately demonstrated that Defendants "expressly aimed" their conduct at Colorado.

The third and final element of the *Calder* effects test is whether Defendants "knew that the brunt of th[e] injury would be felt" in the forum state." 465 U.S. at 789–90. Given that Defendants were fully aware that CEO Kevin Magenis intended to establish the company's principal place of business in Colorado in 2017, and that Defendants were employees of the company for over two years while it grew and expanded its offices in Colorado, the Court finds that Syght has satisfied its burden at this stage of establishing that Defendants were aware the injury would be felt in Colorado. *See Newsome*, 722 F.3d at 1269 (observing that it was fair to infer that defendants knew the brunt of any injury would be felt in Oklahoma when defendants knew the plaintiff's business operated in Oklahoma). Stated differently, Defendants knew Syght's business was "based in Colorado, and therefore knew the effects of [their misrepresentations and omissions of fact] would be felt there." *Dudnikov*, 514 F.3d at 1077.

The Court therefore finds that Syght has satisfied the three elements of the *Calder* effects test and met the "purposeful direction" requirement for its tort claims.

2.     Unjust Enrichment Claim

Next, Defendants argue that Syght cannot establish minimum contacts for its quasi-contractual unjust enrichment claim that Defendants benefitted from payments made as a result of the Agreement. (Doc. # 12 at ¶¶ 69–77.) Syght alleges that Defendants "wrongfully received interest payments" from Syght based on "an above fair market price for their ownership interest in" the company, which Defendants received "as a result of their false and misleading representations of material information and omissions of material information" to Syght during negotiations for the Agreement. (Doc. # 9 at ¶¶ 53–54.) The Court disagrees with Defendants that payments made pursuant to the Agreement have no significant connection to Colorado.[3]

Analyzing purposeful direction with respect to a contractual claim requires the Court to look at Defendants' "relationships with the forum state and its residents." *Dental Dynamics*, 946 F.3d at 1230 (quoting *Old Republic Ins. Co. v. Continental Motors, Inc.*, 877 F.3d 895, 905 (10th Cir. 2017)). In this case, the Court finds that Syght has sufficiently established, at this stage, that Defendants would not be "haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts" with Colorado. *Burger King*, 471 U.S. at 475. On the contrary, Sara Partee owned at least a 43% membership interest in a company that established its principal place of business in Colorado under her management, and both Sara and Jonathan Partee were employed by and significantly interacted with the company, its executives, officers, and

---

[3] Defendants reiterate their argument that the Agreement exists between Sara Partee and "a Pennsylvania business entity." (Doc. # 12 at ¶ 72.) The Court again rejects Defendants' attempt to ignore the company's principal place of business in Colorado.

employees located in Colorado for over two years. Moreover, exercising personal jurisdiction is proper "where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." *Id.* Sara Partee was the sole owner of the company prior to Charles Partee and Kevin Magenis, both residents of Colorado, acquiring ownership shares in 2015 and 2016. (Doc. # 12-4 at ¶¶ 25, 27–28.) Furthermore, before hiring Kevin Magenis as CEO, Jonathan Partee and Sara Partee understood that he intended to move the company's principal place of business to Colorado. (Doc. # 20 at ¶ 9.) Under these circumstances, the Court finds that Defendants "created 'continuing obligations' between themselves and residents of the forum." *Burger King*, 471 U.S. at 476. The Agreement, whereunder the company repurchased 1,125,000 membership units from Sara Partee for $1.8 million, is substantially related to Colorado given the company's principal place of business and Defendants' ongoing relationship with the company in Colorado prior to and during negotiations. Therefore, the Court finds that Syght has demonstrated that Defendants purposefully directed their activity at the forum state with respect to all four of its claims.

## B.    "ARISE OUT OF"

Having determined that Defendants "purposefully directed" their activities at the forum state, the Court turns to the second prong of the minimum contacts inquiry: whether Syght's injuries "arise out of" Defendants' contacts with the forum jurisdiction. *Dudnikov*, 514 F.3d at 1078. "In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum state.'" *Bristol-*

*Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017) (brackets omitted)

(quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

The Tenth Circuit has described two tests that potentially satisfy the "arise out of"

requirement: (1) the "but-for" test; and (2) the "proximate-cause" test. *Newsome*, 722

F.3d at 1269–70; *accord Dudnikov*, 514 F.3d at 1079 (declining to "pick" one test over

the other). The court explained:

> Under the but-for approach, any event in the causal chain leading to the
> plaintiff's injuries is sufficiently related to the claim to support the exercise
> of specific jurisdiction. The proximate cause approach, by contrast, is
> considerably more restrictive and calls for the court to examine whether
> any of the defendant's contacts with the forum are relevant to the merits of
> the plaintiff's claims.

*Newsome*, 722 F.3d at 1269–70 (brackets omitted) (quoting *Dudnikov*, 514 F.3d at

1078).

In the instant case, Defendants do not raise any argument relating to the "arise

out of" requirement. Nevertheless, the Court finds that Syght has adequately

established that Defendants' contacts with the forum are relevant to the merits of

Syght's claims. *See Newsome*, 722 F.3d at 1270. Syght alleges that it was injured by

Defendants making false and misleading representations of fact and omissions of fact to

Syght's officers and board in Colorado in order to maximize the purchase price for Sara

Partee's ownership interest in the company, which had its principal place of business in

Colorado. (Doc. # 1 at ¶¶ 16–20.) Syght has therefore shown that the claimed injury

resulted from Defendants' forum-related activities. *See Newsome*, 722 F.3d at 1271.

For the foregoing reasons, the Court finds that Syght has established that

Defendants' conduct satisfies minimum contacts with Colorado by demonstrating that

Defendants purposefully directed their activities at Colorado's residents and Syght's claims arise out of those activities.

## C.   TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL JUSTICE

Even if, as here, a plaintiff has met its burden of establishing minimum contacts, the Court must "still inquire whether the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice." *Old Republic*, 877 F.3d at 908 (quoting *Shrader v. Biddinger*, 633 F.3d 1235, 1240 (10th Cir. 2011)); *see also Int'l Shoe*, 326 U.S. at 316. In doing so, the Court must be "cognizant of the fact that, with minimum contacts established, it is incumbent on defendants to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Old Republic*, 877 F.3d at 909 (quoting *Dudnikov*, 514 F.3d at 1080). In assessing whether personal jurisdiction over a defendant with minimum contacts is reasonable in light of the circumstances surrounding the case, the Court considers:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies.

*Newsome*, 722 F.3d at 1271 (quoting *OMI Holdings*, 149 F.3d at 1095).

First, Defendants argue that the burden of defending this action in this forum "would be enormous." (Doc. # 12 at ¶ 81.) They contend that they live "almost 1,500 miles from this Court's courthouse in Denver," that flights from Pittsburgh to Denver or back take more than three hours, and that an economy flight ticket purchased on eight weeks' notice costs at least $600. (*Id.*) Although travel may be expensive or

inconvenient, Defendants do not explain why the burden they face would be different than that in any case in which "the parties reside in different fora" and "one side must bear the inconvenience of litigating 'on the road.'" *Dudnikov*, 514 F.3d at 1081. For example, "[D]efendants have not indicated that their defense of this case would be hindered by the territorial limits on the Colorado district court's power to subpoena relevant witnesses, or indeed hampered in any other significant way." *Id*. The Court therefore finds that requiring Defendants to litigate in this jurisdiction would not present a patently unreasonable burden. *See Rainy Day Books, Inc. v. Rainy Day Books & Café, L.L.C.*, 186 F. Supp. 2d 1158, 1166–67 (D. Kan. 2002) ("In this era of Internet communications, faxes, telecommunications, and relatively inexpensive travel, requiring Defendant to litigate in this jurisdiction is not constitutionally unreasonable.").

Next, the Court must take into consideration the forum's state interest in resolving the dispute. Previously, this Court found that Syght's principal place of business is in Colorado and the brunt of the alleged injury was sustained in Colorado. A State generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. *Burger King*, 471 U.S. at 473. However, Defendants argue that some or all of the issues in this case may be governed by Pennsylvania law. *See OMI Holdings*, 149 F.3d at 1096 ("[A] state's interest is also implicated where resolution of the dispute requires a general application of the forum state's law."). The Court finds that neither party has presented a compelling argument relating to this factor and it does not weigh heavily in either party's favor.

Third, the Court must weigh the plaintiff's interest in receiving convenient and effective relief. *Newsome*, 722 F.3d at 1271. "This factor may weigh heavily in cases where a Plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit." *OMI Holdings*, 149 F.3d at 1097. Defendants contend that this factor does not support this Court exercising jurisdiction because "[t]he state and federal courts in Pennsylvania are as open to Syght as the courts sitting in Colorado." (Doc. # 12 at ¶ 86.) However, Syght argues that its employees, corporate records, and third-party witnesses are located in Colorado, and Defendants are the only potential witnesses in Pennsylvania. (Doc. # 18 at 18.) The Court finds that this factor favors Syght.

Fourth, the Court inquires "whether the forum state is the most efficient place to litigate the dispute." *OMI Holdings*, 149 F.3d at 1097. "Key to this inquiry are the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation." *Id.* (citations omitted). The Court finds that this factor is neutral. Although the majority of the witnesses are in Colorado, the wrong underlying the lawsuit—Defendants' allegedly false and misleading representations—occurred in both Colorado and Pennsylvania. It has also yet to be determined whether Colorado law or Pennsylvania law will apply to Syght's claims.

Finally, the Court must determine whether the "exercise of personal jurisdiction by [the forum] affects the substantive social policy interests of other states or foreign

nations." *Id.* Defendants make no showing of why the social policy interests of Pennsylvania would be affected by this action proceeding in Colorado. The Court therefore finds that this factor weighs in favor of Syght.

The Court concludes that Defendants have failed to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Dudnikov*, 514 F.3d at 1080. The Court finds that Syght has made a prima facie case that the Court should exercise specific personal jurisdiction over Defendants because they have sufficient minimum contacts with Colorado and the assertion of such jurisdiction comports with federal due process requirements.

## IV.   **CONCLUSION**

For the foregoing reasons, the Court DENIES Defendants' Motion to Dismiss for Lack of Personal Jurisdiction. (Doc. # 12.)

DATED:  October 4, 2022

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge